**John E. Phillips, Attorney at Law, P.C.**
975 N. Silverbell Rd. #87968
Tucson, AZ  85754
Telephone: (520) 441-2800
E-mail: John@Johnephillips.com
State Bar Number: 015243
Attorney for Plaintiff

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

| | |
|---|---|
| Susan Cooper,<br>　　　　　Plaintiff,<br>　　vs.<br>The Lincoln National Life Insurance Company; THE REINALT-THOMAS CORPORATION; Reinalt-Thomas Corporation dba Discount Tire/America's Tire/Discount Tire Direct; Group Long Term Disability Plan for Employees of THE REINALT-THOMAS CORPORATION,<br>　　　　　Defendants. | Case No:<br><br>**Complaint**<br>**(Demand for Jury)** |

Now comes the Plaintiff Susan Cooper (hereinafter referred to as the "Plaintiff"), by and through her attorney, John E. Phillips, Attorney at Law, P.C. and complaining against the Defendants, she states:

**Jurisdiction**

1. Jurisdiction of the Court is based upon the Employee Retirement Income Security Act of 1974 (ERISA); and in particular, 29 U.S.C. §§1132(e)(1) and 1132(f). Those provisions give the district courts jurisdiction to hear civil actions brought to recover employee benefits. In addition, this action may be brought before this Court pursuant to 28 U.S.C. §1331, which gives the Court jurisdiction over actions that arise under the laws of the United States.

2. Jurisdiction of the Court is also based upon 28 U.S.C. § 1367(a). This provision gives the district courts supplemental jurisdiction to hear all other claims that are so related to claims in the action within such original jurisdiction that they form

part of the same case or controversy under Article III of the United States Constitution.

### Parties

3. Plaintiff is a resident of Maricopa County, Arizona.
4. Upon information and belief, THE REINALT-THOMAS CORPORATION and Reinalt-Thomas Corporation dba Discount Tire/America's Tire/Discount Tire Direct (hereinafter the "Company") sponsored, administered, and purchased a group long term disability insurance policy which was insured by The Lincoln National Life Insurance Company (hereinafter "Lincoln"). The specific Lincoln Group Disability Policy is known as Policy No. 000010119845 (hereinafter referred to as the "Policy"). The Company's purpose in sponsoring, administering and purchasing the Lincoln policy was to provide disability insurance for its employees. Upon information and belief, the Lincoln policy may have been included in and part of the Group Long Term Disability Plan for Employees of THE REINALT-THOMAS CORPORATION (hereinafter "Plan") and was created to provide the Company's employees with disability benefits. At all times relevant hereto, the Plan constituted an "employee welfare benefit plan" as defined by 29 U.S.C. § 1002(1).
5. Upon information and belief, Lincoln functioned as the claims administrator of the policy; however, pursuant to the relevant ERISA regulation, the Company and/or the Plan may not have made a proper delegation or properly vested fiduciary authority or power for claim administration in Lincoln. The Company is responsible for Lincoln's actions and decisions.
6. The Company, Lincoln, and the Plan are present within Maricopa County and the events giving rise to this Complaint, including the breech, occurred within the State of Arizona.

### Venue

7. Venue is proper in this district pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391.

**Statement of Facts**

8. Plaintiff became disabled under the Policy as she was unable to perform the Main Duties of her Own Occupation due to medical illness or sickness on September 29, 2016. The specific medical illnesses or sicknesses as determined by Lincoln to be disabling under the Policy were: delusional paranoid mood-disorder, schizoaffective disorder, anxiety, panic impaired concentration, and poor judgment. (Claim File pg. (hereinafter "CF") 23)

9. Plaintiff also suffers from severe physical impairments, consisting of: hypertension and obesity as determined by treating physician Dr. Darren Saikely (CF pg. 1492).

10. These impairments are indefinite (CF 23).

11. Plaintiff began receiving $2,071.97 in monthly, long-term disability benefits from Lincoln, with benefits first payable as of March 28, 2017. (CF 1724)

12. The Policy contains a "Mandatory Vocational Rehabilitation Benefit Provision," requiring beneficiaries take part in a vocational rehabilitation program developed by Lincoln in good faith, absent good cause for not doing so, with input from the beneficiary and the beneficiary's physician(s), and any prospective employer when appropriate. (CF 376)

13. On January 11, 2018, Lincoln's Vocational Rehabilitation Coordinator Ms. Triska Henry-Byrd informed Plaintiff she would continue to receive long-term disability benefits if she returned to work at a different employer, although it would require communicating with the new employer given the long-term disability benefits would continue dependent on how much Plaintiff earns through the new employment. (CF 286)

14. On January 31, 2018, Ms. Henry-Byrd determined Plaintiff would be unable to take part in vocational rehabilitation with good cause existing which "would render the claimant unable to take part in or complete a program…" (CF 291)

15. Specifically, Plaintiff was unable to engage in work adjustment training due to back pain. (CF 290)

16. On June 28, 2018 Plaintiff spoke with Ms. Henry-Byrd and stated she was working with an independent vocational rehabilitation provider and had been looking for a job. (CF 277)
17. Lincoln operated under a conflict of interest in evaluating Plaintiff's long-term disability claim due to the fact that it operated in dual roles as the decision maker with regard to whether Plaintiff was disabled as well as the payor of benefits.
18. Lincoln saved money when it denied Plaintiff's claim.
19. Lincoln immediately terminated Plaintiff's long-term disability benefits on the basis that Plaintiff's "plan to return to work on a full-time basis" established Plaintiff was "no longer disabled and we are paying benefits to this date." (CF 1368)
20. On July 10, 2018, Plaintiff called Lincoln and asked about the status of her claim. In response, Lincoln informed Plaintiff that her *stating* she planned to return to work closed her claim. (CF 273) Plaintiff responded she did not realize her claim would be closed due to this and that she was mentally ill, but Lincoln informed Plaintiff the decision had been made. (CF 273)
21. Lincoln had previously told Plaintiff she could not only seek a return to work, but in fact successfully return to work without loss of benefits dependent on the amount of earnings Plaintiff receives through the new employment. (CF 286)
22. On July 24, 2018, Lincoln received Plaintiff's "request for an appeal to reinstate long term disability benefits" which explained all employers she had contacted had informed Plaintiff they had no positions available due to her disabilities and requested Lincoln review two statements from Plaintiff's treating physicians. (CF 1233)
23. The statements from the treating physicians produced on Lincoln's forms said:
    Plaintiff is mentally unstable, easily overwhelmed, unable to function in work setting…not able to work in any capacity at this time. Totally disabled indefinitely….mental impairments…class 5 – Patient has

significant loss of psychological, physiological, personal & social adjustment (severe limitations) (CF 167).

This establishes continuing, severe disability.

24. On August 22, 2018, Plaintiff called Lincoln to request the status of her appeal and Lincoln informed Plaintiff her prior letter did not "appeal" the termination of Plaintiff's benefits, it stated Plaintiff wanted to "reinstate" the long-term disability benefits (CF 270) **In fact Plaintiff's letter said both** (CF 1233). Lincoln lied.

25. On August 28, 2018, Lincoln determined Plaintiff's appeal was to be denied on the basis Plaintiff had reported she was: "returning to work," "feels great," and is "functioning well." (CF 270).

26. On October 29, 2018, Lincoln prepared a letter, informing Plaintiff she was able to submit additional information to support continuing disability, when the determination had already been made, but not disclosing the fact that Plaintiff's appeal had been denied (CF 844).

27. On November 21, 2018, Lincoln prepared a letter informing Plaintiff of their denial of Plaintiff's appeal but Plaintiff never received this letter (CF 836).

28. On October 29, 2019, Plaintiff called Lincoln, requesting the status of Plaintiff's appeal, Lincoln informed Plaintiff no further appeals would be taken, and this action follows.

29. Lincoln informed Plaintiff that Plaintiff had until June 28, 2021 to file this lawsuit. (CF 838)

30. As a result of Lincoln's actions, Plaintiff was forced into abject poverty, and ultimately experienced permanent financial harm as a result of filing for early retirement with the Social Security Administration.

### Nature of the Complaint
### Count 1 – ERISA

31. Plaintiff incorporates by reference paragraphs 1-30.

32. Incident to her employment, Plaintiff was a covered employee pursuant to the Plan and the relevant Policy and a "participant" as defined under 29 U.S.C. §1002(7). Plaintiff seeks disability income benefits from the Plan and the relevant Policy pursuant to §502(a)(1)(B) of ERISA, 29 U.S.C. §1132(a)(1)(B), as well as any other employee benefits she may be entitled to from the Company, the Plan and/or any other Company Plan as a result of being found disabled in this matter.

33. After working for the Company as a loyal employee for years, Plaintiff became disabled due to serious physical and psychological conditions and was unable to work in her Own Occupation as of September 29, 2016.

34. Under the Policy, a 180-day "elimination period" in which no benefits are payable followed, with long-term disability benefits first paid to Plaintiff March 28, 2017.

35. Defendant has determined Plaintiff's Own Occupation is as a File Clerk, defined in the United States Department of Labor, Bureau of Labor Statistics' Dictionary of Occupational Titles (hereinafter "DOT") number 206.387-034. U.S. Dept. of Labor. Bureau of Labor Statistics. *Dictionary of Occupational Titles*. 4th ed., Revised 1991. Vol. I, pg. 176.

36. The DOT defines File Clerk (DOT No. 206.387-034) as consisting of:

    > Files records in alphabetical or numerical order, or according to subject matter or other systems: reads incoming material and sorts according to file system. Places cards, forms, microfiche, or other material in storage receptacle, such as file cabinet, drawer, or box. Locates and removes files upon request. Keeps records of material removed, stamps material received, traces missing files, and types indexing information or folders. May verify accuracy of material to be filed. May enter information on records. May examine microfilm and microfiche for legibility using microfilm and microfiche viewers. May color-code material to be filed to reduce filing errors. May be designated according to subject matter such as Change-of-

37. The DOT further defines File Clerk (DOT No. 206.387-034) as a "light[1]" strength occupation. *Id.*
38. The DOT further defines File Clerk (DOT No. 206.387-034) as a "Reasoning Development Level 3[2]" occupation. *Id.*
39. The DOT further defines File Clerk (DOT No. 206.387-034) as a "Mathematical Development Level 2[3]" occupation. *Id.*
40. The DOT further defines File Clerk (DOT No. 206.387-034) as a "Language Development Level 3[4]" occupation. *Id.*

---

[1] The DOT defines "light" work as: exerting up to 20 pounds of force occasionally (i.e. one-third of the time), and/or up to 10 pounds of force frequently (i.e. one to two-thirds of the time), and/or a negligible amount of force constantly (i.e. two-thirds or more of the time). .S. Dept. of Labor. Bureau of Labor Statistics. *Dictionary of Occupational Titles*. 4th ed., Revised 1991. Vol. II, Appendix C – Components of the Definition Trailer, pg. 1013.

[2] The DOT defines "reasoning development level 3" as work involving: "apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form. Deal with problems involving several concrete variables in or from standardized situations." *Id.* at pg. 1011.

[3] The DOT defines "mathematical development level 2" as work involving: "add, subtract, multiply, and divide all units of measure. Perform the four operation with like common and decimal fractions. Compute ratio, rate, and percent. Draw and interpret bar graphs. Perform arithmetic operations involving all American monetary units.." *Id.*

[4] The DOT defines "reasoning development level 3" as work involving: "Reading: read a variety of novels, magazines atlases, and encyclopedias. Read safety rules, instructions in the use and maintenance of shop tools and equipment, and methods and procedures in mechanical drawing and layout work.; Writing: Write reports and essays with proper format, punctuation, spelling, and grammar, using all parts of speech.; Speaking: Speak before an audience with poise, voice control, and confidence, using correct English and well-modulated voice." *Id.*

Address Clerk (clerical); or according to material filed, such as File Clerk, Correspondence (clerical).

41. Plaintiff has remained "disabled" as that term is defined in the relevant Policy provisions, continuously since September 29, 2016 and has not been able to return to work in any occupation as a result of her serious medical and psychological conditions.
42. The relevant Lincoln policy and definition of disability governing Plaintiff's long-term disability claim is as follows:
    a. DISABILITY or DISABLED means Total Disability or Partial Disability.
    b. TOTAL DISABILITY or TOTALLY DISABLED will be defined as follows:
        1. During the Elimination Period and Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee is unable to perform each of the Main Duties of his or her Own Occupation.
        2. After the Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee is unable to perform each of the Main Duties of any occupation which his or her training, education or experience will reasonably allow.
    c. PARTIAL DISABILITY or PARTIALLY DISABLED will be defined as follows:
        1. During the Elimination Period and Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee:
            a. is unable to perform one or more of the Main Duties of his or her Own Occupation; or is unable to perform such duties full-time; and
            b. is engaged in Partial Disability Employment.
        2. After the Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee:
            a. is unable to perform one or more of the Main Duties of any occupation which his or her training, education or experience

      will reasonably allow; or is unable to perform such duties full-time; and

     b. is engaged in Partial Disability Employment.

  d. PARTIAL DISABILITY EMPLOYMENT means the Insured Employee is working at his or her Own Occupation or any other occupation; however, because of a Partial Disability:

   1. the Insured Employee's hours or production is reduced;

   2. one or more Main Duties of the job are reassigned; or

   3. the Insured Employee is working in a lower-paid occupation.

    i. During Partial Disability Employment, his or her current earnings:

   1. must be at least 20% of Pre-disability Income; and

   2. may not exceed the percentage specified in the Partial Disability Benefit section. (Claim File, pgs. 348-350)

43. Under the Policy, the Own Occupation period extends 24 months after the Elimination Period, meaning the Own Occupation period applied from March 28, 2017 through March 28, 2019, followed by the Any Occupation period extending from March 28, 2019 through Plaintiff's Social Security normal retirement age, that being July 28, 2021. (CF 344)

44. On January 31, 2018, Lincoln concluded Plaintiff was not able to return to even part time gainful employment due to what are permanent mental conditions and physical conditions (CF 284).

45. On June 28, 2018, Plaintiff's benefits were terminated on the basis that Lincoln was "informed on 6/28/2018 that you plan to return to work on a full-time basis." (CF 1368).

46. On July 10, 2018, Plaintiff informed Lincoln that she was not aware her stating an intent to seek a part-time job would result in termination of her benefits and Plaintiff informed Lincoln she was mentally ill. (CF 273)

47. In fact, on January 16, 2018, Lincoln had informed Plaintiff she could return to work and benefits would still be payable, subject to the amount of earnings Plaintiff received from any new employment. (CF 286)
48. Plaintiff's report of a mere intent to seek a part-time job is not, and cannot be, evidence that Plaintiff was capable of performing all the Main Duties of her Own Occupation, or all the Main Duties of Any Occupation as the hope of obtaining work at some point in the future does not establish an actual ability to perform the Main Duties of Plaintiff's Own Occupation or Any Occupation.
49. On July 20, 2018, Plaintiff again informed Lincoln she was unemployed and she wanted to have her long-term disability benefits reinstated due to Plaintiff's mental and physical disabilities.
50. On August 28, 2018, Lincoln determined Plaintiff's appeal was to be denied on the basis Plaintiff had reported she was: "returning to work," "feels great," and is "functioning well." (CF 250)
51. On November 21, 2018, Lincoln prepared a letter informing Plaintiff that Lincoln had reviewed all medical evidence and concluded Plaintiff was not Totally Disabled from performing the Main Duties of Plaintiff's Own Occupation and Plaintiff's appeal was denied. (CF 836)
52. During the course of Lincoln's denial of Plaintiff's appeal, Lincoln obtained a report from an individual mysteriously identified as "AMAMA3" and Lincoln's denial of Plaintiff's appeal was based on the report of AMAMA3 (Claim File, pgs. 841-843).
53. Lincoln did not give this report to Plaintiff.
54. Lincoln is required to provide a "full and fair review" of Plaintiff's appeal of the termination of her long-term disability benefits under 29 C.F.R. § 2560.503-1(h)(2).
55. In order to provide a full and fair review, Lincoln is required under 29 C.F.R. § 2560.503-1(h)(3)(iv) to provide to Plaintiff, identification of all medical or vocational experts whose advice was obtained on behalf of the plan in connection

with a claimant's adverse benefit determination, without regard to whether the advice was relied upon in making the benefit determination. This is due process.

56. Lincoln's failure to provide the identification and views of medical expert AMAMA3 is a denial of due process and a violation of ERISA.

57. Under 29 C.F.R. § 2560.503-1(h)(4)(i), Lincoln was also required to provide Plaintiff with any new or additional evidence considered, relied upon, or generated by the plan, insurer, or other person making the benefit determination in connection with the claim as soon as possible and sufficiently in advance of the date on which the notice of adverse benefit determination on review is required to be provided to give the claimant a reasonable opportunity to respond prior to that date. Lincoln's failure to provide the identification and views of AMAMA3 is a denial of due process and a violation of ERISA, but the failure to provide this information prior to Plaintiff's response being due was a further violation of ERISA.

58. Lincoln is under an obligation to provide claimants and beneficiaries a description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary, under 29 C.F.R. § 2560.503-1(g)(iii).

59. At no point did Lincoln inform Plaintiff that the medical statements of treating physicians Drs. Elizabeth Brown and Risa Newell were insufficient in establishing continuing eligibility for long-term disability benefits, and only in denying Plaintiff's appeal did Lincoln prepare a letter informing Plaintiff the statements completed by Drs. Brown and Newell contained "no specific restrictions or limitations" which would support continuation of long-term disability benefits under the Policy. (CF 837)

60. Drs. Brown and Newell's medical statements are on Lincoln's very own forms and actually do contain specific restrictions and limitations precluding Plaintiff from performing the Main Duties of Plaintiff's Own Occupation, or Any Occupation.

61. Lincoln violated 29 C.F.R. §§ 2560.503-1(h)(3)(iv), 2560.503-1(h)(4)(i), 2560.503-1(g)(iii) and did not provide a full and fair review of Plaintiff's appeal of the termination of Plaintiff's long-term disability benefits.
62. Nothing in the Policy suggests a report of an *intent* to seek work is even relevant evidence concerning the question of Plaintiff being unable to perform the Main Duties of her Own Occupation.
63. Lincoln was required to have a "*meaningful dialogue*" with Plaintiff prior to taking any adverse benefit determination, including both the initial termination of Plaintiff's long-term disability benefits as well as the denial of Plaintiff's appeal. If Lincoln required more information to make a reasoned decision, *they must ask for it. Booton v. Lockheed Medical Benefit Plan*, 110 F.3d 1461, 1463 (9th Cir.1997).
64. Instead, Lincoln terminated Plaintiff's disability benefits on Plaintiff's dream that Plaintiff planned to seek work, decided to stand by this decision, declined to actually inform Plaintiff of this decision for months, and misinformed Plaintiff that the basis of Lincoln's denial of Plaintiff's appeal was on the basis of an invalid medical report from an anonymous, purported nurse only known as "AMAMA3." Lincoln violated ERISA in failing to provide Plaintiff a full and fair review.

**Count II – Breach of Contract and Violation of Arizona Law**

65. Plaintiff incorporates by reference paragraphs 1-64.
66. Under A.R.S. § 20-1402(a)(1), each group disability policy shall contain in substance a provision that: "in the absence of fraud, all statements made by the policyholder or by any insured person shall be deemed representations and not warranties, and that no statement made for the purpose of effecting insurance shall avoid such insurance or reduce benefits unless contained in a written instrument signed by the policyholder or the insured person, a copy of which has been furnished to the policyholder or to the person or beneficiary."
67. In accordance with A.R.S. § 20-1402(a)(1), the Policy states:

> In the absence of fraud, all statements made by the Policyholder and by Insured Employees are representations and not warranties. No statement made by an Insured Employee will be used to contest the coverage provided by this Policy, unless:
>
>> 1. it is contained in a written statement signed by that Insured Employee; and
>>
>> 2. a copy of the statement has been furnished to that Insured Employee.

68. The sole basis Lincoln terminated Plaintiff's long-term disability benefits was on the basis that Plaintiff had reported an intent to seek part-time work, although on appeal, Lincoln adds Plaintiff verbally reported she felt great and was functioning well. None of these verbal representations constitute relevant evidence even suggesting Plaintiff can perform the Main Duties of her Own Occupation, the relevant standard under the Policy.

69. Lincoln's reliance on Plaintiff's representations in support of termination of Plaintiff's benefits is a breach of the contract, a contract provision as required under A.R.S. § 20-1402(a)(1).

70. Under 29 U.S.C. § 1144(a), ERISA preempts state laws as they may relate to any employee benefit plan, but under 29 U.S.C.§ 1144(b)(2)(A) state laws regulating insurance are an exception to preemption.

71. As A.R.S. § 20-1402(a)(1) is a state law regulating insurance, it is exempted from preemption. But even if it were not, the Policy provision itself is valid and binding on the parties.

72. The sole basis of the termination of Plaintiff's long-term disability benefits was on the basis of Plaintiff's verbal representation that she intended to seek work, Lincoln 's termination of Plaintiff's benefits on the basis of Plaintiff's representations in violation of A.R.S. § 20-1402(a)(1) and the Policy, breaching the contract and also violating state law.

**Count III – Breach of Implied Covenant of Good Faith and Fair Dealing**

73. Plaintiff incorporates by reference paragraphs 1-72.
74. The law implies a covenant of good faith and fair dealing in every contract. *Wagenseller v. Scottsdale Memorial Hospital*, 147 Ariz. 370, 383, 710 P.2d 1025, 1038 (1985); *see also:* Restatement (Second) of Contracts § 205 (1981).
75. As recognized by the Supreme Court of Arizona, when an insurer is faced with a conflict of interest, the proper procedure is not to "betray" one insured to protect the company's own purse, but to represent each insured independently. *Rawlings v. Apodaca*, 151 Ariz. 149, 726 P.2d 565, 569 (Ariz. 1986).
76. Lincoln was aware Plaintiff could not return to work, as determined by Lincoln's own Vocational Rehabilitation Coordinator Ms. Triska Henry-Byrd. (CF 284)
77. Lincoln was aware Ms. Henry-Byrd informed Plaintiff she could return to work and not endanger her receipt of long-term disability benefits, subject to the amount of earnings Plaintiff was to receive in any new employment. (CF 286)
78. Lincoln was aware Plaintiff suffered from debilitating mental impairments, delusional paranoid mood disorder and panic impaired concentration in particular, that would necessarily have to be considered in interpreting any representations made by Plaintiff.
79. As recognized by the *Rawlings* Court, the "the implied covenant of good faith and fair dealing can be breached even though the company performs its express covenants under the insurance contract. The implied covenant is breached, whether the carrier pays the claim or not, when its conduct damages the very protection or security which the insured sought to gain by buying insurance." *Id.* at 573.
80. Lincoln not only failed to perform its express covenants under the Policy, Lincoln did so to its advantage in terminating Plaintiff's claim for benefits, which was the very protection or security Plaintiff sought to gain by buying insurance.

81. Lincoln abused, horrifically, Plaintiff by exploiting Plaintiff's mental illness to Lincoln's own advantage as demonstrated by:
    a. Informing Plaintiff she could seek work without endangering Plaintiff's long-term disability benefits.
    b. Terminating Plaintiff's long-term disability benefits on the sole basis that Plaintiff represented she intended to seek work in violation of state law and the Policy.
    c. Deciding Plaintiff's appeal would be denied again on this basis, yet informed Plaintiff the appeal would be denied on the basis of an anonymous medical report.
82. As recognized by *Rawlings* Court, the intent required is that of an "evil hand" or the "intent to do the act." *Id.* at 576. An "evil mind" is not required, although the circumstances clearly demonstrate this as well. All that is required to support additional, punitive damages, as to the violation of the implied covenant of good faith and fair dealing is proof that Lincoln intended its act or omission, lacking a founded belief that such conduct was permitted by the Policy. *Id.*
83. Lincoln violated the implied covenant of good faith and fair dealing.

WHEREFORE, Plaintiff prays for judgment as follows:

A.   For an immediate Order, directing the parties file a copy of all evidence available to them;

B.   For an Order, determining Plaintiff is disabled on the evidence of record, under the Policy *de novo*;

C.   For an Order, directing Lincoln pay Plaintiff's long-term disability benefits she is owed under the Policy through July 28, 2021, the maximum benefit period, amounting to $51,799.25;

D.   For an Order, enjoining Lincoln from reducing beneficiaries' benefits on the basis of statements made by the beneficiaries.

1      E.     For an Order, providing equitable relief under 29 U.S.C. § 1132(a)(3), enjoining Lincoln from refusing to disclose the identities and views of medical and vocational experts obtained on behalf of the plan in connection with an adverse benefit determination, prior to Lincoln rendering the adverse benefit determination;

      F.     For attorney's fees and costs incurred as a result of prosecuting this suit pursuant to A.R.S. § 12-341.01(A).

      G.     For punitive damages to be determined by a jury.

      H.     Imposition of a constructive trust;

      I.     A demand for Jury is hereby made; and

      J.     For such other and further relief as the Court deems just and proper.

**DATED** this 24th day of June, 2021.

                    /s/John E. Phillips
                    JOHN E. PHILLIPS,
                    Attorney at Law, P.C.
                    Attorney for Plaintiff

## VERIFICATION

STATE OF ARIZONA            )
                            )ss:
COUNTY OF MARICOPA          )

**Susan Cooper**, being first duly sworn, under oath states:

1. I am the Plaintiff in the above-entitled matter.

2. I make this Verification based upon my personal knowledge, information or belief.

3. I have read the foregoing Complaint and know the contents therein.

4. The facts and matters alleged in the Complaint are true in substance and in fact to the best of my knowledge, except to those matters alleged on information and belief and, as to those I believe them to be true.

_____
Susan Cooper

SUBSCRIBED AND SWORN to before me on this 21 day of June, 2021, by Susan Cooper.

_____
Notary Public

Notary Public State of Arizona
Maricopa County
Sami Amireh
My Commission Expires 02/24/2025
Commission Number 588015

My Commission Expires:

02/24/25

Page 1 of 1

John E. Phillips, Attorney at Law, P.C.
975 N. Silverbell Rd. #87968
Tucson, AZ 85754
Telephone: (520) 441-2800
E-mail: John@Johnephillips.com
State Bar Number: 015243